The STATE of Ohio, Appellee,

v.

DAWS, Appellant.

[Cite as *State v. Daws* (1994), 104 Ohio App.3d 448.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 13914.

Decided July 27, 1994.

450

*Mathias H. Heck, Jr.,* Montgomery County Prosecuting Attorney, and *Walter F. Ruf,* Assistant Prosecuting Attorney, for appellee.

*David A. Chicarelli* and *Ronald W. Ruppert,* for appellant.

WOLFF, Judge.

Susan M. Daws was charged by indictment with the murders of her former husband, Dwayne Daws, and the woman with whom he was allegedly involved, Karen Houseman. Each murder charge carried a firearm specification. After a trial by jury, Susan was found guilty of the two lesser included offenses of voluntary manslaughter and two firearm specifications.

Susan and Dwayne Daws had a stormy marriage. The details of their relationship are disputed. The following is Susan's version of the events leading up to the deaths of Dwayne and Karen.

Susan and Dwayne were married in 1982. Susan was already pregnant with Dwayne's child. During her pregnancy, Dwayne, in a drunken state, twisted Susan's arm and threw her into a bedroom. Susan was forced to call the paramedics to get her out.

In 1983, Dwayne joined the army, and the couple moved to Fort Campbell, Kentucky. Dwayne, apparently unhappy with military service, began to drink heavily and became more abusive towards Susan. He attempted to isolate her from her family by removing the phone so that she was forced to go to a laundromat to call them. Dwayne told Susan that "things would get better" if she got pregnant again, so she did. However, during her second pregnancy, Dwayne threw Susan against a bedpost while he was drunk. As a result of this incident, Susan spotted blood for two days, but Dwayne refused to let her go to the doctor to make sure the baby was not hurt.

After Susan gave birth to this child in 1985, Dwayne decided to leave the army, and the family returned to Springboro, Ohio. Susan decided that she wanted to attend Sinclair Community College to become a respiratory therapist. Dwayne did not want her to go back to school, and the couple argued often on this topic. Ultimately both Susan and Dwayne enrolled in Sinclair's respiratory therapy program.

In May 1988, Susan attempted suicide.

One night in 1989, Susan came home to find Dwayne drunk, sitting on the stairs with a gun. He started screaming and yelling and threw Susan up against a wall. Then he shot the gun, and a bullet went between her legs. Immediately after the incident, Dwayne was apologetic and acted as if nothing had happened.

Thereafter, Dwayne's drinking escalated, and he became more abusive. In 1989, just prior to Thanksgiving, Susan went to a bar where Dwayne was drinking in order to transfer some items from the trunk of her car to the trunk of his car. She went into the bar to tell Dwayne what she had done, and he seemed fine. However, Dwayne followed Susan to the parking lot, struck her several times, and dragged her to his car. He then drove her to her parent's house and continued beating her in front of her mother and their children. After her mother threatened to call the police, Dwayne left. As a result of this incident, Susan's eyes were blackened, her cheekbone fractured, and her body bruised.

After the Christmas of 1990, Susan asked Dwayne to leave and told him that she wanted to end their marriage. Dwayne moved out of the house, and Susan contacted an attorney in order to file for a dissolution. However, Susan ultimately decided not to go through with the dissolution because Dwayne threatened to hurt himself if she did.

In June 1991, Dwayne moved back in with Susan, and they lived peacefully for several months.  Then Dwayne began drinking again and reverted to his earlier abusive behavior.  Once, while the children were watching, Dwayne dragged Susan up the stairs by her hair, threw her against the wall, and threw her against the refrigerator.

Later that summer, Susan and Dwayne separated again, and Dwayne moved into a condominium owned by Karen Houseman and her husband, Marshall.  Dwayne and Karen began having an affair.  Susan filed for a divorce in October.

Unhappy about the prospect of paying child support, Dwayne decided to seek custody of the children and told Susan that he would get the children because of her earlier suicide attempt.  On the day of her court date, Susan, convinced that Dwayne would take her children away, again attempted suicide.

After Susan recovered, the divorce proceedings continued.  Dwayne and Karen were not getting along, and she asked him to leave the condominium.  Dwayne told Susan that if she let him come back to live with her, he would not seek custody of the children.  On that condition, Susan let him move back in, but she continued the divorce proceedings.  In 1991, the divorce was finalized, and Susan was granted custody.

Susan allowed Dwayne to stay in her apartment after the divorce because he had stopped drinking and was attending AA meetings.  She thought he deserved another chance.  However, Dwayne ultimately started drinking again and quit attending the meetings.  One night while he was drunk, Dwayne grabbed Susan, held a gun to her head, and screamed that he was going to kill her.

In July, Susan decided that they should separate again, and she told him that she wanted him to leave.  Thereafter, Dwayne disappeared.  Susan tried to get in touch with him and called some of his friends.  She called Karen Houseman and talked to Marshall.  During the conversation, Susan told Marshall that Dwayne had been having an affair with Karen for two and a half years.  When Marshall became angry, Susan instantly regretted having told him and asked him not to say anything to Dwayne because Dwayne would get mad at her.

The next day, Dwayne called Susan from Karen's condominium.  He told her that he had been in a fight with Marshall and asked that she bring him his gun.  Susan talked with him for a while and determined that, although he knew she had told Marshall about the affair, he was not angry with her.  He seemed to be only angry with Marshall.

After she hung up the phone, Susan considered what she should do.  She thought that if she did not bring him the gun, Dwayne would eventually come to get it and be extremely angry that he had to do so.  She was also worried that Dwayne would come to get the gun when the children were home.  Finally, Susan

decided to take the gun to him and "see what happened." She put the gun in her purse and drove to Karen's condominium.

When she arrived, Susan left her car running. As she started to get out of the car, Dwayne, his face covered with blood, opened the front door. Susan walked into the condominium and sat down on the couch. Karen started screaming at her, yelling that it was all her fault that Marshall had beaten up Dwayne and taken her children away. Then, Dwayne also started screaming. Susan reached into her purse to get a cigarette, and Dwayne lunged at her, trying to get the gun. A struggle ensued and Susan got to the gun first. She shot him in the leg and they both fell to the floor. Several shots were fired before Susan managed to disentangle herself from Dwayne. Susan ran toward the steps of the condominium, and Dwayne grabbed her and attempted to drag her back. Fearing that Dwayne would kill her, Susan pointed the gun at him and shot once or twice. At that point, Dwayne let go and stopped moving.

Susan went into the kitchen and called 911.

When the police and the paramedics arrived, they found Susan sitting in her car and Dwayne sitting on the floor of the condominium. He was still alive. Karen was not found.

Approximately one and a half hours later, the police transported Susan to the police station. While in the police car, Susan asked the officers if they had checked the garage of the condominium for Karen's Jeep. When the officers searched the garage, they found Karen.

Both Dwayne and Karen died, Dwayne from multiple gunshot wounds to the chest and Karen from one gunshot wound to the chest.

On September 1, 1992, Susan was indicted for purposely causing the deaths of Karen and Dwayne in violation of R.C. 2903.02(A). Each of the two murder charges had an attached firearm specification. On September, 22, 1992, Susan pled not guilty to the charged offenses. Susan claimed that she had acted in self-defense.

The matter went to trial on January 12, 1993, and the jury found Susan guilty of the two lesser included offenses of voluntary manslaughter and two firearm specifications. On February 10, 1993, the trial court sentenced Susan.

Susan appeals from both the judgment and the sentence of the court and asserts eight assignments of error. We will consider these assignments of error in the order which facilitates our analysis rather than in the order of their presentation.

"III. The trial court erred in limiting expert testimony
on the battered woman syndrome."

■ In this assignment of error, Susan asserts that the trial court erred in refusing to allow her expert to testify regarding the battered woman syndrome and its effect on her. Specifically, Susan contends that the trial court improperly precluded her expert from testifying regarding whether Susan reasonably believed that she was in imminent danger on the night of the shooting and whether she reasonably believed it was necessary to use deadly force at the time she fired the gun.

The state, on the other hand, asserts that the trial court properly prevented Susan's expert from testifying as to her beliefs at the time of the shooting because such testimony amounted to impermissible comments on Susan's veracity and *mens rea.* The state further argues that the testimony was properly excluded because it dealt with the ultimate issue in the case and thereby infringed upon the province of the jury.

Thus, we must consider whether an expert on the battered woman syndrome may testify in a case involving self-defense as to whether the defendant had a reasonable belief at the time of the shooting that she was in imminent danger of serious physical injury and whether she reasonably believed it was necessary to use deadly force.

■ In any case involving self-defense, the trier of fact is called upon to determine whether the accused had an honest belief that she was in imminent danger of death or great bodily harm and that the use of force was her only means of escape. See *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, paragraph two of syllabus; *State v. Melchior* (1978), 56 Ohio St.2d 15, 20–21, 10 O.O.3d 8, 11–12, 381 N.E.2d 195, 196. This test is subjective, and the jury must consider the circumstances of the accused and determine whether her actions were reasonable given those circumstances. *State v. Smith* (1983), 10 Ohio App.3d 99, 100, 10 OBR 122, 123, 460 N.E.2d 693, 696.

■ The jury's ability to determine the reasonableness of an accused's actions is dependent on its understanding of the circumstances surrounding the accused. Where the experiences of the accused are not within the experience of the average juror or where the jurors might have misperceptions of those experiences, expert testimony should be permitted to ensure that the jury can make an educated and informed determination of whether the accused's actions were reasonable. See Evid.R. 702; *Stelma v. Juguilon* (1992), 73 Ohio App.3d 377, 597 N.E.2d 523 (Expert testimony permitted as to what a reasonable patient would have consented to had all the risks been disclosed). See, generally, *State v. Koss*

(1990), 49 Ohio St.3d 213, 551 N.E.2d 970; *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881.

It is widely acknowledged that cases involving violent offenses committed by battered women are cases in which expert testimony is necessary to ensure that the jury can make a proper determination of the reasonableness of the accused's actions. "There are * * * prevailing community myths and stereotypes about domestic violence and battered women that [cause jurors] to interpret the offender's circumstances contrary to her own experience of them." Sheehy, Stubbs & Tolmie, Defending Battered Women on Trial: The Battered Woman Syndrome and its Limitations (1992), 16 Crim.L.J. 369, 375. "[T]he psychological reality for battered women greatly differs from the myths and misunderstandings about them * * *." Anderson & Anderson, Constitutional Dimensions of the Battered Woman Syndrome (1992), 53 Ohio St.L.J. 363, 373. Therefore, expert testimony must be admitted to educate the jury as to "what perceptions are reasonable for a female victim of violence." Walker, Thyfault & Browne, Beyond the Juror's Ken: Battered Women (1982), 7 Vermont L.Rev. 1, 4.

Introduction of expert testimony on the battered woman syndrome "is intended to enable unbiased and realistic consideration of the reasonableness of the * * * accused's perceptions of her particular factual circumstances." Sheehy, *supra*, at 376–377. Testimony on the syndrome can (1) counteract the preconceived stereotypes of battered women and (2) explain why the perception of the accused that she was under serious threat and needed to use deadly force may have been reasonable in the circumstances in which she found herself. *Id.* at 376. See, also, Anderson, *supra*; Martin, Ohio Joins the Majority and Allows Expert Testimony on the Battered Woman Syndrome: *State v. Koss*, 49 Ohio St.3d 213, 551 N.E.2d 970 (1990) (1992), 60 U.Cin.L.Rev. 877.

The majority of courts now permit general testimony by an expert on the battered woman syndrome to counteract jury misperceptions about battered women. See *People v. Torres* (1985), 128 Misc.2d 129, 135, 488 N.Y.S.2d 358, 363; *Smith v. State* (1981), 247 Ga. 612, 277 S.E.2d 678; *State v. Allery* (1984), 101 Wash.2d 591, 682 P.2d 312; *State v. Hennum* (Minn.1989), 441 N.W.2d 793; *Hawthorne v. State* (Fla.App.1982), 408 So.2d 801; *People v. Aris* (1989), 215 Cal.App.3d 1178, 264 Cal.Rptr. 167. However, there is no general consensus regarding to what extent, if any, the expert may testify regarding the mental state of the specific accused or regarding the reasonableness of her perception that she was under serious threat and needed to use deadly force at the time she committed the offense. Maguigan, Battered Women and Self–Defense: Myths and Misconceptions in Current Reform Proposals (1991), 140 Pa.L.Rev. 379.

Until 1990, expert testimony on the battered woman syndrome was not admissible for any purpose in Ohio. *State v. Thomas* (1981), 66 Ohio St.2d 518,

20 O.O.3d 424, 423 N.E.2d 137. In banning such testimony, the Ohio Supreme Court found that:

"[T]he only admissible evidence pertaining to [self-defense] is evidence which establishes that defendant had a bona-fide belief she was in imminent danger of death or great bodily harm, and that the only means of escape from such danger was through the use of deadly force. * * *

"The jury is well able to understand and determine whether self-defense has been proven in a murder case without expert testimony such as [the battered woman syndrome testimony] offered here. * * *

"Also, such expert testimony is inadmissible because it is not distinctly related to some science, profession or occupation so as to be beyond the ken of the average lay person." (Citation omitted.) *Id.* at 520–521, 20 O.O.3d at 426, 423 N.E.2d at 139.

In 1990, the Supreme Court reconsidered its ban on battered woman syndrome testimony in *Koss, supra.* Finding that the defendant's mental state is crucial in self-defense cases and recognizing that the study of the battered woman syndrome had progressed since 1981, the Supreme Court held expert testimony on the battered woman syndrome to be admissible. However, the court did not specifically state any guidelines for the use of such testimony at trial. Rather, the court merely stated that:

"Expert testimony regarding the battered woman syndrome can be admitted to help the jury not only to understand the battered woman syndrome but also to determine whether the defendant had reasonable grounds for an honest belief that she was in imminent danger when considering the issue of self-defense." (Emphasis added.) *Koss, supra,* at 216, 551 N.E.2d at 973.

Nowhere in its opinion did the court define or explain what it meant by "expert testimony regarding the battered woman syndrome" or in what context such testimony could be used. Only the purpose for the admission of such testimony is clear. That is, expert testimony on the battered woman syndrome is to be admitted for both its original purpose of dispelling the misconceptions of jurors concerning battered women and its broader purpose of informing the jurors' determination of whether the accused's beliefs and use of force were reasonable.

Thus, the Supreme Court's opinion in *Koss* does not establish the limits, if any, on expert testimony on the battered woman syndrome and thus does little to inform our decision. But, see, *State v. Poling* (May 17, 1991), Trumbull App. No. 88–T–4112, unreported, 1991 WL 84229.

On May 2, 1989, H.B. No. 464 was introduced in the Ohio General Assembly to "specifically authorize expert testimony relative to the 'battered woman syndrome' to be introduced in a criminal action to establish the belief of an imminent

danger of death or great bodily harm that is an element of the affirmative defense of self-defense * * *." 143 Ohio Senate and House Journals (1989–1990) 535. H.B. No. 484 was enacted as R.C. 2901.06, which states as follows:

"(A) The general assembly hereby declares that it recognizes both of the following, in relation to the 'battered woman syndrome:'

"(1) That the syndrome currently is a matter of commonly accepted scientific knowledge;

"(2) That the subject matter and details of the syndrome are not within the general understanding or experience of a person who is a member of the general populace and are not within the field of common knowledge.

"(B) If a person is charged with an offense involving the use of force against another and the person, as a defense to the offense charged, raises the affirmative defense of self-defense, the person may introduce expert testimony of the 'battered woman syndrome' and expert testimony that the person suffered from that syndrome as evidence to establish the requisite belief of an imminent danger of death or great bodily harm that is necessary as an element of the affirmative defense, to justify the person's use of the force in question. The introduction of any expert testimony under this division shall be in accordance with the Ohio Rules of Evidence." (Emphasis added.) [1]

Thus, R.C. 2901.06 specifically recognizes the validity of the battered woman syndrome, acknowledges that the syndrome is outside the understanding of the general public, and authorizes both expert testimony as to the battered woman syndrome generally and testimony that the accused suffered from the syndrome. However, R.C. 2901.06 does not specifically address whether, by permitting expert testimony concerning the syndrome and the expert's determination that the accused suffers from the syndrome, the General Assembly intended to also permit testimony as to the accused's mental state and the reasonableness of her beliefs and of her use of force at the time she committed the offense.

It could be said that the statute's failure to address this possible use of expert testimony on the battered woman syndrome indicates that such testimony is not permitted.

However, it could be argued with equal force that R.C. 2901.06 does permit testimony as to the mental state of the accused and as to the reasonableness of her beliefs and of her use of force. Such an interpretation is reasonable given that the statute expressly states that the purpose for admitting expert testimony

---

1. The General Assembly also enacted R.C. 2945.392 "to specifically authorize expert testimony relative to the * * * 'battered woman syndrome' * * * to establish the impairment of reason that is an element of a finding of not guilty by reason of insanity."

on the battered woman syndrome is "to establish the requisite belief of an imminent danger of death or great bodily harm * * * to justify the person's use of the force in question."

The General Assembly clearly could have permitted testimony on the battered woman syndrome solely for the purpose of refuting any misconceptions the jurors might have concerning battered women. It did not do so. Rather, the General Assembly chose to permit the use of such testimony for the broader purpose of establishing that the accused reasonably believed she was in imminent danger of death or great bodily harm and that her use of force was justified. Clearly, expert testimony on the battered woman syndrome which concerns the accused's mental state and the reasonableness of her beliefs at the relevant time would advance the purpose given by the General Assembly for permitting expert testimony on the battered woman syndrome.

Thus, R.C. 2901.06, like the Supreme Court's opinion in *Koss*, is unclear as to the extent of the use of expert testimony on the battered woman syndrome and therefore does not definitively answer the question of whether an expert on the battered woman syndrome may testify as to the mental state of the accused and the reasonableness of her beliefs and her use of force.

As there is no case law or statutory provisions which either expressly permit or prohibit the admission of expert testimony on the battered woman syndrome which relates to accused's mental state and the reasonableness of her beliefs and of her use of force, we must determine whether such testimony may be admitted under the Ohio Rules of Evidence.

We begin our analysis of the Ohio Rules of Evidence by examining whether expert testimony on the battered woman syndrome which relates to the mental state of the defendant and the reasonableness of her beliefs and of her use of force must be excluded because it deals with the ultimate issues in the case.

While some states still recognize the rule prohibiting testimony as to the ultimate issues of a case, Ohio does not. *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d 77, 81–82, 40 O.O.2d 87, 89–90, 228 N.E.2d 304, 307. See, generally, 7 Wigmore, Evidence (Chadbourn Rev.1978) 18–26, Sections 1920–1921; McCormick, Evidence (4 Ed.Strong Ed.1992) 47–53, Section 12. Evid.R. 704 specifically states:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." (Emphasis added.)

Thus, testimony on an ultimate issue is not *per se* inadmissible in Ohio. However, it is within the discretion of the trial court to refuse to admit the testimony of an .expert witness on an ultimate issue where such testimony is

otherwise inadmissible under the Ohio Rules of Evidence. See *Bostic, supra,* at 148, 524 N.E.2d at 885; *State v. Stirnkorb* (1990), 63 Ohio App.3d 778, 787, 580 N.E.2d 69, 74; *McQueen v. Goldey* (1984), 20 Ohio App.3d 41, 47, 20 OBR 44, 49, 484 N.E.2d 712, 719.

Accordingly, the fact that expert testimony on the battered woman syndrome which relates to the accused's mental state and the reasonableness of her beliefs and of her use of force reaches the ultimate issues in the case does not, in itself, warrant its exclusion. But, see, *Poling, supra.* Therefore, we must consider whether the testimony itself is otherwise inadmissible under the Ohio Rules of Evidence.

■ In order to be admitted at trial, expert testimony must (1) relate to scientific, technical, or other specialized knowledge; (2) assist the trier of fact to understand the evidence or to determine a fact in issue; (3) be relevant and material to an issue in the case; and (4) have a probative value which outweighs any prejudicial impact. Evid.R. 702, 402, and 403. See, also, *Thomas, supra.*

Expert testimony on the battered woman syndrome which relates to the accused's state of mind and the reasonableness of her use of force unquestionably meets the first and third of these criteria. As we stated *supra,* the battered woman syndrome is commonly accepted in the scientific community and was recognized by both the Ohio Supreme Court in *Koss* and the General Assembly in R.C. 2901.06 as being admissible as a theory based upon scientific, technical, or other specialized knowledge. Thus, the first criterion for admissibility of expert testimony on the syndrome is met. Further, expert testimony on the battered woman syndrome which relates to the mental state of the accused and the reasonableness of her beliefs and of her use of force is clearly relevant and material to her self-defense claim. As was acknowledged by the Supreme Court in *Koss,* the mental state of the accused is crucial to the defense of self-defense. Thus, the third criterion for admissibility of expert testimony as to the accused's mental state and the reasonableness of her use of force is met.

■ However, the second and fourth criteria are more problematic. The second criterion for admissibility of expert testimony requires that the expert testimony assist the trier of fact to understand the evidence or to determine a fact in issue. Evid.R. 702. In order to establish that expert testimony will assist the trier of fact, it must generally be established that the subject of the testimony is outside the experience, knowledge, or comprehension of the trier of fact. *State v. Coulter* (1992), 75 Ohio App.3d 219, 228, 598 N.E.2d 1324, 1329. See, also, *Lee v. Baldwin* (1987), 35 Ohio App.3d 47, 49, 519 N.E.2d 662, 664; *Bostic, supra,* at 148–149, 524 N.E.2d at 885–886; *Stelma, supra,* at 384, 597 N.E.2d at 527. If the trier of fact can understand the issues and the evidence and arrive at a correct

determination, expert testimony is unnecessary and inadmissible. *State v. Roquemore* (1993), 85 Ohio App.3d 448, 454–455, 620 N.E.2d 110, 114.

It is clear from both *Koss* and R.C. 2901.06 that Ohio courts must consider the "subject matter and details" of the battered woman syndrome to be outside the ken of the average juror. However, that is not to say that the mental state of a specific accused battered woman and the reasonableness of her beliefs and of her use of force are also beyond the juror's understanding. In fact, the Supreme Court's belief that the jury was "well able" to make these determinations without the aid of expert testimony caused the court to initially ban expert testimony on the syndrome in *Thomas*. See *Thomas, supra,* at 521, 20 O.O.3d at 426, 423 N.E.2d at 139. The fundamental problem with permitting expert testimony on the battered woman syndrome relating to the mental state of a specific accused and the reasonableness of her beliefs and of her use of force is that this use of expert testimony does "not seek to educate the jury about a field with which the ordinary person is unfamiliar * * *. Instead, [this] type of psychological testimony address[es] an area once thought to be the one exclusive area of juror expertise—judgements about people's mental states and how those mental states are reflected in a person's behavior." Murphy, Assisting the Jury in Understanding Victimization: Expert Psychological Testimony on Battered Woman Syndrome and Rape Trauma Syndrome (1992), 25 Columbia J.L. & Soc. Probs. 277, 281–282. See, also, *State v. Kelly* (1984), 97 N.J. 178, 478 A.2d 364.

Indeed, it seems obvious that the average juror is capable of understanding the behavior of average people and is qualified to interpret those behaviors to determine the mental state of an ordinary person. In such cases, the mental health expert has "no special understanding of the defendant or of the situational dynamics, and [there is] no basis for an expert opinion." Bonnie & Slobogin, The Role of Mental Health Professionals in the Criminal Process: The Case for Informed Speculation (1980), 66 Va.L.Rev. 427, 482. However, it is not so obvious that the average juror will be able to interpret the abnormal behaviors of a person suffering from the battered woman syndrome and be able to arrive at a correct determination of that person's mental state when the "subject matter and details" of that syndrome and its effects are outside the jurors' knowledge. See *Stirnkorb, supra,* 63 Ohio App.3d at 787, 580 N.E.2d at 74 ("Where the trier of fact cannot be said to be sufficiently familiar with the facts so as to be able to draw inferences about them, conclusory testimony is admissible"); *State v. Webb* (Nov. 24, 1993), Jackson App. No. 671, unreported, 1993 WL 491322; *Smith, supra,* 247 Ga. at 616, 277 S.E.2d at 681 (where the conclusion of the expert results from factors which are not known by the common man, but "shrouded in the mystery of professional skill or knowledge, then the light of that knowledge should not be withheld from the jury * * *."). "Mental health professionals, on

the other hand, deal constantly with abnormal behavior and are trained to consider explanations that do not proceed from commonsense analysis * * * and it cannot be said that [their testimony would] add nothing of value to the common sense of the [juror]." Bonnie, *supra*, 66 Va.L.Rev. at 485.

For these reasons, we hold that expert testimony on the battered woman syndrome regarding the accused's mental state and the reasonableness of her beliefs and of her use of force meets the second criterion for admissibility established by Evid.R. 702, *i.e.*, that expert testimony on the subject will assist the trier of fact to understand the evidence or to determine a fact in issue.

Finally, the fourth criterion requires that the probative value of the testimony outweigh its prejudicial impact. According to Evid.R. 403:

"(A) * * * Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

From the previous discussions, it is clear that expert testimony on the battered woman syndrome regarding the accused's mental state and reasonableness of her beliefs and of her use of force has significant probative value. Such testimony concerns the ultimate issues in the case and assists the jury in its determination of what actions and beliefs are reasonable for a battered woman.

█ It is possible that this testimony could be prejudicial in that the jury might ascribe excessive, unwarranted weight to the testimony because it is the opinion of an expert.[2] See 1 Weissenberger, Ohio Evidence (1993) 17, Section 403.5. The possibility that an expert will overawe the jury, causing it to forgo an independent analysis of the facts, is present in every case in which expert testimony is permitted. We cannot say that this possibility constitutes "unfair prejudice" as that term is contemplated by Evid.R. 403. Moreover, the possibility that the jurors might be carried away by the testimony of an expert can be diminished by cross-examination on the foibles of the expert's research and by instructions to the jury indicating that it is to examine the credibility of all witnesses. See Brown, Limitation on Expert Testimony on the Battered Woman Syndrome in Homicide Cases: The Return of the Ultimate Issue Rule (1990), 32 Ariz.L.Rev. 665.

---

2. There is also an argument that expert testimony on the battered woman syndrome is prejudicial in that the content of such testimony reflects badly on the character of the victim and impermissibly shifts the focus from the actions of the defendant to the actions of the victim. However, this argument, which was implicitly rejected by the Supreme Court's decision to allow general testimony on the battered woman syndrome, is more applicable to the determination of the prejudicial impact of expert testimony regarding the battered woman syndrome generally than it is to the particular testimony examined in this assignment of error.

Thus, the probative value of expert testimony on the battered woman syndrome relating to the accused's mental state and the reasonableness of her beliefs and of her use of force outweighs any prejudicial impact of such testimony, and the fourth criterion for admission of that testimony has been met.

Accordingly, we conclude that expert testimony on the battered woman syndrome which relates to the accused's mental state and the reasonableness of her beliefs and of her use of force meets the four requirements for admission established by the Ohio Rules of Evidence.

Nonetheless, the state argues that this testimony is still inadmissible because it impermissibly comments on the veracity and the *mens rea* of the accused. We will consider each of these arguments in turn.

In *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220, the Ohio Supreme Court considered the issue of whether an expert could comment on the veracity of the victim in a child abuse case. The court held that "an expert may not testify as to the expert's opinion of the veracity of the statements" of the victim because such testimony " 'acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility. * * * ' " *Id.* at 128–129, 545 N.E.2d at 1239–1240, quoting *State v. Eastham* (1988), 39 Ohio St.3d 307, 312, 530 N.E.2d 409, 414 (Herbert R. Brown, J., concurring). The court found that such testimony was "not only improper—it was egregious, prejudicial and constitute[d] reversible error." *Boston* at 128, 545 N.E.2d at 1239.

In *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899, the Ohio Supreme Court reiterated its holding in *Boston* and stated that:

"[A]n expert may not testify as to the expert's opinion of the truth or falsity, or accuracy or inaccuracy, of the statements of a child declarant."

The cases which have applied *Boston* and/or *Moreland* generally involve statements by experts which in some manner relate to the expert's opinion regarding the veracity of a child declarant. See *State v. Hamilton* (1991), 77 Ohio App.3d 293, 602 N.E.2d 278; *State v. McWhite* (1991), 73 Ohio App.3d 323, 597 N.E.2d 168; *State v. Davis* (1989), 64 Ohio App.3d 334, 581 N.E.2d 604.

However, even assuming that the holding in these cases can be applied to prohibit expert testimony as to the veracity of witnesses generally, this prohibition would not preclude the type of testimony that Susan contemplated using in this case. *Boston* and *Moreland* prohibit an expert from testifying that a witness told the truth about a specific situation or that the witness meets some indicia or criteria which demonstrate that the witness was being truthful. These cases do not prohibit an expert from giving testimony which bolsters the credibility of the witness by substantiating her version of the events in question. Thus, based on

the events described by the accused and the diagnosis that she suffered from the battered woman syndrome, an expert may give his expert opinion that the accused reasonably believed that she was in imminent danger of serious physical harm and that the use of force was necessary. This testimony is no more a comment on the accused's veracity than is the expert's testimony that the accused was a battered woman. However, the expert may not state directly that he believed she was telling the truth about either the events which took place or her claim that she was acting in self-defense.

We turn now to the state's second argument that expert testimony on the battered woman syndrome which relates to the accused's mental state and the reasonableness of her beliefs and of her use of force is inadmissible because it impermissibly comments on the *mens rea* of the accused.

In support of this contention, the state relies on the Supreme Court's decision in *State v. Wilcox* (1982), 70 Ohio St.2d 182, 199, 24 O.O.3d 284, 293, 436 N.E.2d 523, 533. In *Wilcox,* the Ohio Supreme Court examined the viability of a diminished capacity defense in Ohio and held that:

"[T]he partial defense of diminished capacity is not recognized in Ohio * * * and consequently, a defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that the defendant lacked the *mental capacity to form the specific mental state required for a particular crime or degree of crime.*" (Emphasis added and citations omitted.)

Thus, *Wilcox* prohibits expert testimony, unrelated to the insanity defense, as to the mental state of the accused when that testimony is offered to show that the accused lacked the specific mental state required for a particular crime. See, also, *State v. Huertas* (1990), 51 Ohio St.3d 22, 553 N.E.2d 1058. The holding of *Wilcox* is limited to this specific prohibition; it does not comment on whether expert testimony on the mental state of the accused may be admitted to establish that the accused acted in self-defense.[3] See, also, *State v. Cooey* (1989), 46 Ohio St.3d 20, 26, 544 N.E.2d 895, 906 ("The *Wilcox* rule is based on a mistrust of the ability of psychiatry to accurately 'fine-tune' degrees of capacity among offenders who are sane * * *.").

In *Poling, supra,* the Trumbull County Court of Appeals analyzed the *Wilcox* decision in an effort to establish that its prohibition against expert testimony as to the *mens rea* of the accused had not been modified by the Supreme Court's

---

**3.** Ohio has not adopted an analogous provision to Fed.R.Evid. 704(b), which provides:

"No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone."

ruling in *Koss, supra.* In doing so, the court of appeals accurately stated the difference between *mens rea* testimony in cases in which self-defense is claimed and those in which diminished capacity is claimed. The court stated that:

"[T]he belief of 'imminent danger' does not necessarily equate with an absence of the required *mens rea.* In fact, self-defense requires that the defendant purposely have used force because of his or her belief of 'imminent danger' of death or great bodily harm. As an affirmative defense, it is a justification for behavior which otherwise would be criminal. On the other hand, a lack of the required *mens rea* expressed through a defense of insanity *vis á vis* diminished capacity goes to an element of the crime.[4]" *Id.,* Trumbull App. No. 88–T–4112, at 11.

Thus, expert testimony on the battered woman syndrome which relates to the accused's mental state and the reasonableness of her beliefs and of her use of force does not in any way attempt to show that the accused lacked the *mens rea* to commit the crime with which she is charged. Rather, such testimony attempts to establish that the accused's actions were justified despite the fact that she possessed the requisite mental state. Therefore, we find that the *Wilcox* prohibition against mental state testimony does not prohibit expert testimony on the battered woman syndrome which relates to the mental state of the accused and the reasonableness of her beliefs and of her use of force.

We have extensively reviewed the facts of this case and much of the literature and scholarly work concerning the battered woman syndrome and its use at trial. Further, we have reviewed numerous cases examining the use of Evid.R. 702 and 704. Having completed such consideration and review, we must conclude that an expert on the battered woman syndrome may testify as to the mental state of the accused and the reasonableness of her beliefs and of her use of force at the time she committed the offense. See *State v. Spinks* (1992), 79 Ohio App.3d 720, 726, 607 N.E.2d 1130, 1134; *State v. Manning* (1991), 74 Ohio App.3d 19, 24, 598 N.E.2d 25, 28 (expert witness permitted to testify in both cases as to mental state and reasonable beliefs of the accused).

▉ Accordingly, the trial court in this case erred in limiting the testimony of Susan's expert, and the error was not harmless. This assignment of error is sustained.

---

**4.** While the Trumbull County Court of Appeals did find in *Poling* that expert testimony on the *mens rea* of the accused is inadmissible, it appears to have done so based on its interpretation of *Koss* and its belief that the expert should not be permitted to testify as to the ultimate issue in the case.

"I. The trial court erred in instructing the jury."

In this assignment of error, Susan asserts that the trial court erred in failing to instruct the jury on the battered woman syndrome. Given the extensive testimony on the battered woman syndrome during trial, Susan contends that a jury instruction tailored to the syndrome was essential to assist the jury in applying that evidence to her claim of self-defense.

In response, the state argues that this assignment of error was not properly preserved at trial and was therefore waived. Alternatively, the state argues that the failure to give the instruction presented by defense counsel was neither prejudicial nor plain error because the instruction requested was not a correct statement of the law and because the trial court's instruction on self-defense was sufficient.

Crim.R. 30(A), which controls the proper method for preserving error relating to jury instructions, provides in pertinent part:

"On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matters objected to and the grounds of the objection."

Our review of the record indicates that Susan's counsel filed a request for a special jury instruction on the battered woman syndrome on January 20, 1993. In a conference in chambers prior to closing arguments, Susan's counsel stated that he understood that the trial court intended to reject his requested jury instruction and presented his arguments as to why the proposed jury instruction should be given. Susan's counsel concluded by stating, "[f]or the Court not to mention anywhere in the instruction about the battered woman syndrome I think is error." The prosecutor was then given an opportunity to present his arguments as to why the instruction should not be given. After listening to these arguments, the court ruled that an instruction on the battered woman syndrome would not be given because the general instruction on self-defense was sufficient. Susan's counsel then stated, "Okay."

While counsel in this case failed to explicitly state that he objected to the court's refusal to include his requested jury instruction in the charge to the jury, he did specifically state the basis for his belief that the proposed instruction should be included and indicated to the court that he believed it was erroneous not to include it. From this record, it appears that the trial court was aware of counsel's objection to the charge given and had adequate opportunity to reconsider the charge. Therefore, we conclude that Susan's counsel complied with Crim.R. 30(A) sufficiently to preserve this issue for purposes of appeal.

■ Susan's proffered instructions were as follows:

"[1] You have heard evidence that the Defendant suffers from Battered Woman Syndrome. In determining if this is true you must consider the following factors:

"a. The nature and length of her relationship with the deceased;

"b. The history of physical abuse between the couple including, but not limited to, previous reports to the police, physicians, counselors, family or friends; and

"c. The status of the Defendant, that is, did she have small children to care for, the psychological assessment of her by the experts who testified in this case.

"[2] If you find from all of your deliberations that evidence presented shows the Defendant suffered from Battered Woman syndrome, you must consider that fact in assessing her state of mind at the time of the homicide.

"[3] If you find from all of your deliberations that she did not so suffer then you must not consider that fact in assessing her state of mind at time of the homicide.

"[4] A person is justified in the use of force when and to the extent that she reasonably believes that such conduct is necessary to defend herself against the imminent use of force.

"[5] However, a person is justified in the use of [sic] which is intended or likely to cause death or great bodily harm only if she reasonably believes as a Battered Woman that such force is necessary to prevent imminent death or great bodily harm to herself or the commission of a forcible felony.

"[6] A person who suffers from the Battered Woman syndrome may reasonably believe such force is necessary at a threshold lower than that which a person [sic] does not so suffer would consider reasonable.

"[7] You have heard evidence that the victim in this case has committed certain violent acts against the Defendant. If, after your consideration of the evidence, you believe this to be true, you must consider that fact in assessing whether the Defendant was in fear at the time of the homicide."

■ Our review of these proposed jury instructions indicates that they are improper for several reasons. First, paragraph one mandates that the jury consider three factors in determining whether Susan was a battered woman. However, this list of factors is not exhaustive of the factors relevant to this determination nor are the factors given necessarily the most important considerations in determining whether Susan was a battered woman. Thus, this instruction incorrectly highlights certain evidentiary factors to the jury and improperly

limits the jury's deliberation to those factors. Second, paragraphs four and five, which attempt to explain the law of self-defense, were also improper in this case. Paragraph four explains when the use of force against another is justified. However, it does not explain when the use of deadly force is justified and is thus not relevant to a homicide case in which the accused claims that she acted in self-defense. Paragraph five, on the other hand, does contain the pertinent law of this case and explains to the jury what circumstances justify the use of deadly force. However, in instructing the jury to consider what Susan "reasonably believes as a Battered Woman," paragraph five implies that Susan's status as a battered woman could justify her use of force. Thus, this instruction tends to elevate the battered woman syndrome to the level of an independent affirmative defense, rather than informing the jury that evidence of the syndrome is merely one factor to consider in evaluating Susan's self-defense claim. Therefore, paragraph five does not accurately inform the jury as to the proper use of evidence relating to the battered woman syndrome. See *Koss, supra.* Finally, paragraph six is misleading in informing the jury that a battered woman may reasonably believe that force is necessary at a threshold lower than others who do not suffer from the syndrome. As stated *supra,* Ohio has a subjective test in self-defense cases. Therefore, the reasonableness of the accused's beliefs and actions are determined on a case-by-case basis, and there are no objective "thresholds" or "reasonable person" standard. A woman's status as a battered woman does not alter her evidentiary burden in establishing her self-defense claim. Any instruction suggesting otherwise would be improper. Although paragraph six, taken in isolation, may be a correct abstract statement, it tends to invite the jury to excuse unreasonable behavior.

However, we do believe that given the complexity of the syndrome itself and its limited applicability to the defense, some specific instruction with respect to the battered woman syndrome would have been appropriate. For instance, the jury should have been instructed that the battered woman syndrome is not a defense in and of itself and that evidence of it is only offered to assist the jury in determining whether the defendant acted out of a reasonable belief that she was in imminent danger of death or great bodily harm and that the use of force was her only means of escaping that danger. Additionally, the jury should have been instructed that it could only consider the evidence of the battered woman syndrome if it found that the defendant was a battered woman.

Accordingly, we agree with Susan that an instruction tailored to the battered woman syndrome was warranted in this case. However, as discussed above, the proposed jury instructions were not limited to matters of law and did not

accurately reflect the law of Ohio. Therefore, we must conclude that the trial court did not err in refusing to accept them.

The first assignment of error is overruled.

"II. The trial court erred in restricting voir dire questioning of the jurors."

In this assignment of error, Susan claims that the trial court erred in limiting her voir dire of prospective jurors. Specifically, Susan contends that the trial court erroneously refused to permit questioning as to what the jurors had heard about the battered woman syndrome and what they understood the syndrome to be. Susan asserts that this questioning was crucial to the determination of whether any of the prospective jurors held misperceptions concerning battered women and should therefore be dismissed for cause.

We disagree.

As this court stated in *State v. Storer* (Apr. 10, 1991), Clark App. No. 2671, unreported, 1991 WL 60633, at 7–8:

"Controlling the scope of voir dire is the duty of the trial court. * * * Prejudicial error does not exist absent a clear demonstration that the trial court abused that discretion. * * * Examination of those called for jury duty is limited to inquiries aimed at determining their qualifications and must not be used to 'pre-try' one's case. * * * In this regard, the court is invested with the statutory right to control the extent, scope, and direction of inquiry on voir dire, while permitting a general exploration into potential biases which would interfere with the impartial consideration of the issues presented." (Citations omitted.)

The record in this case indicates that the trial court permitted Susan to inquire as to (1) whether the prospective jurors had any personal experience or knowledge about the syndrome; (2) whether that experience or knowledge would prevent them from keeping an open mind; (3) whether anything would prevent them from being fair and impartial; (4) whether they could be fair in evaluating her state of mind if the evidence established that she returned to her relationship with Dwayne after being beaten by him on several occasions.

We believe that these questions were sufficient to examine whether the jurors were biased regarding the battered woman syndrome to the extent that they could not impartially consider the issues presented. Moreover, we see no reason why direct questioning as to each prospective juror's understanding of the battered woman syndrome would be critical. The only critical question was whether, given what they knew, the jurors could be impartial in evaluating the syndrome. This question was permitted by the trial court in several different forms.

Accordingly, we conclude that the trial court did not abuse its discretion in limiting the scope of voir dire. The second assignment of error is overruled.

"IV. The trial court erred in failing to compel the state to produce discovery."

In this assignment of error, Susan contends that the trial court erred in permitting the state to introduce evidence at trial which it failed to disclose as required by Crim.R. 16. Specifically, Susan asserts that the trial court erred in admitting (1) the testimony of the state's psychologist, Dr. Phyllis Kuehnl, and (2) Exhibit No. 49, which contained a handwritten transcription of all of the statements which Susan made to the police on the night of the murders. Susan claims that the testimony of Dr. Kuehnl should have been excluded because the state failed to provide the defense with a report of the doctor's evaluation of Susan and that Exhibit No. 49 should have been excluded because it was not disclosed prior to trial. We will examine each of these allegations in turn.

Crim.R. 16(B)(1) controls the disclosure of evidence by the prosecuting attorney and states in pertinent part:

"(d) *Reports of examination and tests.* Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, made in connection with the particular case, * * * available to or within the possession, custody or control of the state * * *." (Emphasis added.)

Thus, Crim.R. 16(B)(1)(d) requires the prosecuting attorney to permit the defendant to inspect and copy any results or reports of mental examinations which were made in connection with a particular case. Crim.R. 16(B)(1)(d) does not require the prosecuting attorney to have such results or reports prepared.

Nonetheless, Susan asserts that the prosecuting attorney is required to have *its* psychologist prepare a report of his findings. *In support of this* contention, Susan relies on R.C. 2945.39. Although Susan admits that this section "traditionally deals with insanity pleas," she argues that it is nonetheless applicable to this case because it specifically addresses court-ordered investigation reports.

We disagree.

R.C. 2945.39 controls the examination of a defendant's mental condition at the time of the alleged offense in cases in which the defendant has pled not guilty by reason of insanity. In such cases, the statute provides for court-ordered examinations of the defendant's mental state and mandates that the examiner complete a report concerning the defendant's mental state within thirty days of the examination. See R.C. 2945.39(C). This statute is expressly limited to cases in

which an insanity plea has been entered and cannot be said to apply in any other context.

Moreover, we have not found, and Susan has not indicated to us, any statutory or other authority which requires the state's examiner to prepare a report in all cases in which a mental examination is performed.

The record in this case indicates that the state provided the defense with a copy of all of the documents which were made in connection with Dr. Kuehnl's evaluation of Susan. These documents included a single-paged letter from Dr. Kuehnl indicating that she did not believe that Susan suffered from the battered woman syndrome and the results of Susan's Minnesota Multiphasic Personality Inventory ("MMPI"). Therefore, the state provided Susan with all the documents required by Crim.R. 16(B)(1)(d).

Nonetheless, Susan contends that the state still violated the discovery requirements because these documents were not provided in a timely fashion.

Our examination of the record indicates that Dr. Kuehnl evaluated Susan on January 4, 1993. On January 7, 1993, Susan filed a motion to compel discovery wherein she requested that the trial court order the State to make available to her any report or opinion rendered by Dr. Kuehnl. On January 6, the prosecutor faxed a letter to Susan indicating that he would be forwarding a letter from Dr. Kuehnl containing her conclusions when it became available. The prosecutor received the letter from Dr. Kuehnl on January 7, and Susan received a copy of it on January 8. A copy of the MMPI test results was also provided to the defense within one business day of their receipt by the prosecutor.

Given that the state provided the defense with a copy of both of these documents one business day after receiving the documents from Dr. Kuehnl, we find that the state's compliance with discovery was not untimely.

Accordingly, we find that the state did not violate the requirements of Crim.R. 16(B)(1)(d) either in its disclosure of the documents provided by Dr. Kuehnl or in its failure to require Dr. Kuehnl to provide a report of her findings. Therefore, the state did not fail to comply with discovery, and the trial court did not err in admitting Dr. Kuehnl's testimony at trial.

We now consider Susan's assertion that the state violated Crim.R. 16 by failing to disclose the existence of Exhibit No. 49 and that this violation warranted the exclusion of this exhibit from trial.

Regarding the disclosure requirements of statements of the defendant, Crim.R. 16(B)(1)(a) states in pertinent part:

"Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following

which are available to, or within the possession, custody, or control of the state
* * *.

" * * *

"(ii) Written summaries of any oral statement, or copies thereof, made by the defendant or codefendant to a prosecuting attorney or any law enforcement officer." (Emphasis added.)

Thus, Crim.R. 16(B)(1)(a)(ii) "requires no more than * * * a summation" of the oral statements of the defendant. *State v. Maynard* (Nov. 22, 1985), Wood App. Nos. WD–84–98 and WD–85–3, unreported, 1985 WL 8230, at 4. It does not require a verbatim transcript, detailing the specifics of every remark made by the defendant. *Id.* A summation is sufficient to enable the defendant to pursue further details of the statement in preparation of his defense. *Id.*

Our review of the record indicates that the state provided Susan with copies of several police reports. Contained in the report submitted by Detective Moore was a section entitled "Statements Made By Suspect" in which Detective Moore indicated that he had taken notes of the statements made by Susan on the night of the murders. Detective Moore then proceeded to either summarize the statements given or to provide a quotation of what was said. The state did not provide Susan with a copy of Exhibit No. 49, which contained Detective Moore's handwritten verbatim notes of Susan's statements.

A comparison of Detective Moore's report and Exhibit No. 49 indicates that the vast majority of the statements contained in Exhibit No. 49 were recopied in the report. However, it seems that the report omitted a statement indicating that Susan had spoken with Dwayne on the night before the murders, that Dwayne was irate, and that he and Karen had acted like they were going to work.

The omission of this one statement does not violate Crim.R. 16(B)(1)(a)(ii). See *Maynard, supra.* Moreover, as this rule only requires the disclosure of a "written summary" of the defendant's statements, we conclude that the state was not required to disclose the original, handwritten notes of the detective.

Moreover, even were we to find that the state was required to disclose the original notes and that a violation did occur, we would not find that the trial court abused its discretion in admitting Exhibit No. 49 into evidence. In order to find that the trial court abused its discretion by permitting the admission of evidence which the prosecution failed to disclose as required by Crim.R. 16(B)(1)(a)(ii), a reviewing court must determine "(1) that the prosecution's failure to disclose was a willful violation of Crim.R. 16, (2) that foreknowledge of the statement would have benefited the accused in the preparation of his defense, or (3) that the accused was prejudiced by the admission of the statement." *State v.*

*Parson* (1983), 6 Ohio St.3d 442, 6 OBR 485, 453 N.E.2d 689, syllabus. See, also, *State v. Spirko* (1991), 59 Ohio St.3d 1, 570 N.E.2d 229.

In this case, there is no evidence that the state willfully violated Crim.R. 16. Rather, the fact that the prosecution provided Susan with Detective Moore's report indicates that the prosecution made a good faith effort to comply with the rule.

Further, there is no indication that foreknowledge of the omitted statement would have benefitted Susan in the preparation of her defense. However, Susan contends that foreknowledge of Exhibit No. 49, itself, would have benefited the preparation of her defense. Specifically, Susan argues that Detective Moore's report was insufficient because it implied that all of the statements were transcribed by Detective Moore when in fact portions of the statements were made to and transcribed by other officers. As a result of this misrepresentation, Susan claims that she was unable to fully investigate her case. Assuming *arguendo* that the number of officers taking notes of Susan's statements was somehow relevant to her defense, we nonetheless find this argument to be without merit. First, as Susan was physically present while making these statements, we can assume that Susan was fully aware at the time she made her statements that those statements were being "transcribed" by police officers. Moreover, Susan would have had firsthand knowledge that Detective Moore was not the only officer taking notes of her conversations, and there was no need for the prosecution to inform her of that fact. Second, Detective Moore's report clearly indicates the presence of other officers, and the names of those officers, who may have heard Susan's statements. Third, in one section of his report, Detective Moore specifically stated that another officer, Patrolman Garrison, took ·a portion of the notes of Susan's statements. For these reasons, we conclude that the disclosure of Exhibit No. 49 would not have benefitted Susan in the preparation of her defense.

Finally, we fail to see, and Susan does not indicate to us, how she was prejudiced by the admission of the one statement which was not included in Detective Moore's report.[5] This statement did not relate to events which took place on the day of the killings or in any way relate to Susan's guilt or innocence of the crimes with which she was charged.

Accordingly, we conclude that the trial court did not abuse its discretion in admitting Exhibit No. 49 at trial. The fourth assignment of error is overruled.

---

5. In her brief, Susan claims that she was prejudiced by the admission of her statement to the police officers which questioned whether they had checked the garage for Karen's jeep. However, the prejudicial effect of this question, if any, did not result from any discovery violation because that interrogative statement was included in Detective Moore's report and was thus disclosed to the defense as required by Crim.R. 16(B)(1)(a)(ii).

"V.  The trial court erred in failing to dismiss the charges against the defendant upon the misconduct of the prosecutor."

In this assignment of error, Susan claims that trial court erred in refusing to dismiss the charges against her because the discovery violations alleged in her fourth assignment of error constituted a denial of her right to a fair trial. Having determined in the fourth assignment of error that no discovery violations occurred, we find that the trial court did not err in refusing to dismiss the charges on this basis.

Accordingly, the fifth assignment of error is overruled.

"VI.  The trial court erred in allowing improper rebuttal testimony."

In this assignment of error, Susan claims that the trial court erred in permitting the rebuttal testimony of two witnesses, Brian Dixon and Mark Sinclair.  Susan asserts that Dixon's and Sinclair's testimony concerning her relationship with Dixon and other men did not counteract any evidence introduced by the defense and was not proper rebuttal testimony.  Susan further asserts that Sinclair's testimony regarding Susan's statement that she learned to shoot a gun at a gravel pit was likewise improper on rebuttal and was also inadmissible according to Evid.R. 613.

In response, the state argues that Susan failed to object to Dixon's testimony and that any errors resulting from the testimony were waived.  The state further contends that the testimony of both Dixon and Sinclair as to Susan's relationships with other men was proper rebuttal testimony because they were offered to refute Susan's claim that she was a battered woman who could not "escape the clutches of a battering spouse."  Finally, the state asserts that the testimony regarding Susan's statement that she had learned to shoot a gun at a gravel pit was proper rebuttal and did not violate Evid.R. 613(B) because it related to questions asked of Susan during cross-examination and also refuted her claim that she suffered from battered woman syndrome.

Our review of the record indicates that Susan did not object to any portion of Dixon's testimony until after Sinclair began his testimony.  Therefore, any error associated with Dixon's testimony has been waived, and we will only address the allegations of error which relate to Sinclair's rebuttal testimony.  See Evid.R. 103(A)(1); *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

We first consider whether Sinclair's testimony was proper rebuttal. We agree with the state that Sinclair's testimony was proper rebuttal testimony. His testimony as to Susan's relationships with other men tended to refute Susan's claim that she was a battered woman who could not escape her abusive husband.

Further, Sinclair's testimony that Susan told him that she went to a gravel pit to learn how to shoot a gun approximately a month before she killed Dwayne and Karen directly contradicted Susan's testimony on cross-examination that she had not fired a weapon from the time she was about sixteen years of age until the day she shot Dwayne and Karen.

We now consider Susan's contention that Sinclair's testimony that she told him she had learned to shoot a gun at the gravel pit was in violation of Evid.R. 613(B).

Evid.R. 613(B) states in pertinent part:

"Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded a prior opportunity to explain or deny the same * * *. * * * This provision does not apply to admissions of a party-opponent as defined in Rule 801(D)(2)." (Emphasis added.)

As a defendant in a criminal trial is a "party-opponent" as contemplated by Evid.R. 801(D)(2), Evid.R. 613(B) does not apply to statements made by the defendant. See *State v. Wheeler* (July 16, 1993), Montgomery App. No. 12290, unreported, 1993 WL 265133, at 9. Therefore, the state may prove that the defendant made an inconsistent statement without affording the defendant a prior opportunity to explain that statement.

The sixth assignment of error is overruled.

"VII. The trial court erred in sentencing the defendant."

After the jury returned verdicts of guilty on two counts of voluntary manslaughter, the trial court sentenced Susan as follows:

"Count One: Not less than ten years nor more than twenty-five years of which eight years is actual incarceration;

"Count Two: Not less than ten years nor more than twenty-five years of which seven years is actual incarceration."

Both parties in this case agree that this sentence is erroneous in that the actual incarceration period is not the minimum term that was imposed. R.C. 2929.11(B)(1), which prescribes the penalties for an aggravated felony of the first degree, states in pertinent part:

"(a) If the offender has not previously been convicted of or pleaded guilty to any aggravated felony.* * * or any offense set forth in any existing or former law of this state * * *, the minimum term, which may be imposed as a term of actual incarceration, shall be five, six, seven, eight, nine, or ten years, and the maximum term shall be twenty-five years." (Emphasis added.)

Thus, R.C. 2929.11(B)(1)(a) allows the trial court to impose a minimum term of five, six, seven, eight, nine, or ten years with a maximum term of twenty-five years. Further, the court may, in its discretion, impose the minimum term as a period of actual incarceration. "The statute makes no provision for the imposition of a term of actual incarceration different from the minimum term imposed." *State v. Henderson* (Jan. 25, 1989), Hamilton App. No. C–870893, unreported, 1989 WL 4701.

Accordingly, the trial court erred in imposing an actual term of incarceration which was less than the minimum term imposed.

The seventh assignment of error is sustained.

> "VIII. The cumulative weight of the errors
> deprived the defendant of a fair trial."

Having determined in conjunction with the third assignment of error that the trial court committed reversible error in failing to permit expert testimony as to Susan's mental state and the reasonableness of her beliefs at the time she killed Dwayne and Karen, we need not consider whether the errors alleged in the other assignments of error cumulatively deprived Susan of a fair trial.

Accordingly, the eighth assignment of error is overruled.

The judgment of the Montgomery County Court of Common Pleas will be reversed, and the matter will be remanded for further proceedings consistent with this opinion.

*Judgment reversed
and cause remanded.*

BROGAN and FREDERICK N. YOUNG, JJ., concur.