OPINION
Defendant-appellant, Ramon Gomez-Silva, appeals his conviction and sentence in the Butler County Court of Common Pleas for murder and felonious assault in connection with the death of his infant daughter.
Appellant, a twenty-one-year-old native of Mexico, and Lashana Brown, sixteen years of age, were the parents of Maria Guadalupe Gomez-Silva. Maria was eleven weeks old in June 2000 when she suffered blunt impact trauma to the head that resulted in a skull fracture and a subdural hematoma. At the time of her death, Maria's injuries were also found to include approximately forty-one rib fractures, a broken bone in each leg, dislocation of two vertebrae, a laceration of the liver, retinal hemorrhages, a bite mark to the cheek, and numerous bruises predominately about the face and head.
Maria's mother, maternal grandmother, and a neighbor took Maria to a Hamilton hospital on the evening of June 9, 2000. The child was apparently not breathing when she arrived at the hospital. Maria was resuscitated and transported to Children's Hospital in Cincinnati, but she never regained the ability to breathe unassisted. Maria was removed from life support and pronounced dead on June 12, 2000.
While Maria was being treated in the hospital in Hamilton, Hamilton Police allegedly took a statement from Brown at the hospital. Police asked appellant to accompany them to the police station to take his statement. Officer Eric Taylor, a Hamilton police officer fluent in Spanish, interpreted the conversations between appellant and the investigating detective. Appellant was read his Miranda rights during the course of providing oral statements and was subsequently arrested after providing a written statement.
Appellant was tried by a jury and convicted of murder pursuant to R.C.2903.02(B) and of felonious assault pursuant to R.C. 2903.1(A)(1).[1]
Appellant was sentenced to a term of fifteen years to life for the murder conviction and a term of eight years for the felonious assault conviction with the two sentences to run consecutively. Appellant appeals his conviction and sentence, and presents ten assignments of error.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED BY OVERRULING DEFENDANT'S MOTION TO SUPPRESS
Appellant argues that his constitutional rights were violated and that statements he made to the police at the police station should be suppressed. Appellant first asserts that Miranda warnings should have been given to appellant earlier in his encounter with police because his statements were made during the course of a custodial interrogation.
When considering a motion to suppress evidence, the trial court serves as the trier of fact and is the primary judge of the weight of the evidence and the credibility of witnesses. State v. Fanning (1982),1 Ohio St.3d 19, 20. When reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's findings if they are supported by competent, credible evidence, State v. McNamara
(1997), 124 Ohio App.3d 706, 710, and relies upon the trial court's ability to assess the credibility of witnesses. State v. Anderson
(1995), 100 Ohio App.3d 688, 691. Relying on the trial court's factual findings, we then must determine without deference to the trial court whether the court has applied the appropriate legal standard. State v.Ramirez-Garcia (2001), 141 Ohio App.3d 185, 187.
The prosecution may not use a statement stemming from custodial interrogation of the defendant unless it demonstrates the use of effective procedural safeguards to secure the privilege against self-incrimination. Miranda v. Arizona (1966), 384 U.S. 436, 444,86 S.Ct. 1602, 1612. The U.S. Supreme Court described custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. The determination of whether a custodial interrogation has occurred requires an inquiry into how a reasonable person in the detainee's position would have felt in the same position. State v. Mason (1998), 82 Ohio St.3d 144, 154. The ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. Id.
According to Officer Taylor's testimony on the motion to suppress, appellant was asked to accompany the officers to the police station to give a statement because of the "chaotic" atmosphere and the number of people present at the hospital. Officer Taylor testified that appellant agreed to give a statement at the police station. Appellant apparently responded to questions regarding Maria's condition before the Miranda
warnings were issued, but the content of the initial statement was not disclosed at the motion to suppress hearing.
A review of the evidence adduced at the suppression hearing supports a finding that appellant was not in custody and that a custodial interrogation did not occur to trigger the issuance of Miranda warnings prior to when the warnings were given. The fact that a suspect is being interviewed at the police station does not, per se, require a Miranda
rights warning. Id. The police did not place appellant into custody, appellant was not handcuffed, and he willingly accompanied the officers to the police station to give a statement. Appellant was questioned in an open office area where several desks were located. Based upon the finding that appellant was not subjected to a custodial interrogation, Miranda
warnings were not required at that time and appellant's constitutional rights were not violated.
Appellant next asserts that the Miranda warnings that were subsequently given were deficient. There is no rigid rule requiring that the content of the Miranda warnings given to an accused be a virtual incantation of the precise language contained in the Miranda opinion. State v. Dailey
(1990), 53 Ohio St.3d 88, 90. A translation of a suspect's Miranda
rights need not be perfect or verbatim if the suspect understands that he need not speak to the police, that any statement made may be used against him, that he has a right to an attorney, and that an attorney will be appointed if he cannot afford one. Ramirez-Garcia,141 Ohio App.3d at 188, citing Duckworth v. Eagan (1989), 492 U.S. 195, 210-215,109 S.Ct. 2875, 2884-2887.
Officer Taylor testified that he read appellant his Miranda rights in Spanish and gave appellant a Miranda warning card in Spanish to read while he was explaining his rights. Appellant signed the warning card.
After hearing the evidence, the trial court concluded that appellant was "properly read his rights as articulated by Miranda v. Arizona
* * *." Officer Taylor translated into English for the trial court what he conveyed to appellant in Spanish:
 I am a police. I am giving you the notice to you that I am presenting you the right to remain silent, that any words that you use will be used and, uh, will be used, will be used against your interest in a tribunal of justice, literally that you have the right to consult with an attorney during the scene in any way, any interrogation, that you may be in the presence of a lawyer while you are being interrogated, and if need me you don't have the resources to hire an attorney, uh, that will be that will be done to you in your interest with no charge to you during this interrogation or any interrogation, interrogation with me or with any other police officer. Okay? Now, uh, do you understand the collection of your rights just as I have read them to you, and that you have the understanding of these rights, and do you still want to speak to us in the presence of a lawyer?
Officer Taylor testified that he asked appellant about having a lawyer present, and that appellant stated that he had nothing to hide and that he was willing to make a statement because he did not want the police to think he had any involvement in the incident.
The trial court's findings were supported by competent and credible evidence. Officer Taylor's translation was sufficient to convey the essence of the Miranda warning to appellant. Therefore, Miranda warnings given to appellant were not deficient.
Appellant finally argues that his statements were involuntary and the result of coercion based on appellant's inability to understand English, his unfamiliarity with the American legal system, and the fact that a police officer was serving as his interpreter. Officer Taylor testified that after he read appellant the Miranda warnings in Spanish appellant only questioned the meaning of the Spanish words for "without charge" or "without cost," and that the officer explained that term to him. As we previously stated, appellant sufficiently understood what his rights were to state that he had nothing to hide and that he was willing to make a statement.
In determining a confession's voluntariness, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused, the length, intensity and frequency of interrogation, the existence of physical deprivation or mistreatment, and the existence of threat or inducement. State v. Smith
(1991), 61 Ohio St.3d 284, 288.
We have already outlined some of the factors before the trial court to determine that appellant understood the warnings presented. In addition, appellant was twenty-one years of age, reportedly completed the ninth grade of education in Mexico, and had been in the United States for five years. Officer Taylor also testified that appellant would occasionally begin answering the English questions posed by the investigating detective before Taylor had the opportunity to translate. There was no evidence in the record of deprivation, threat or coercion by police.
There was also testimony that Officer Taylor was competent to serve as a translator for appellant. The officer was born in South America, and Spanish was the primary language in his childhood home in the United States. Officer Taylor indicated that he speaks Spanish almost every day as a police officer and that he has had previous occasions to speak with individuals from the same location of Mexico in which appellant lived.
The trial court reviewed the translation of the Miranda warnings and heard the testimony of Officer Taylor regarding the events leading to appellant's statements. The trial court determined that appellant "knowingly, intelligently and voluntarily gave up his rights to counsel and agreed to give a voluntary, written statement." The trial court further stated that it believed that Officer Taylor, "did everything reasonably necessary under the circumstances to make sure the defendant [appellant] understood his rights, was given the opportunity to exercise those rights and made sure the defendant's [appellant's] rights were meticulously honored."
The trial court's findings are supported by competent and credible evidence and we find no error in its application of law. The trial court did not err in denying the motion to suppress. Appellant's first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED BY NOT EXCLUDING EVIDENCE OBTAINED FROM THE INTERROGATION OF DEFENDANT-APPELLANT, WHERE NO ONE NOTIFIED DEFENDANT-APPELLANT, A CITIZEN OF MEXICO, OF HIS RIGHTS PURSUANT TO ARTICLE 36 OF THE VIENNA CONVENTION ON CONSULAR RELATIONS, INCLUDING, BUT NOT LIMITED TO HIS RIGHT TO CONTACT THE MEXICAN CONSULATE.
It appears from the record that appellant was not notified of his rights under Article 36 of the Vienna Convention on Consular Relations. It also appears that the alleged error was not raised to the trial court. An appellate court need not consider an error that was not called to the attention of the trial court at a time when such error could have been avoided or corrected by the trial court. State v. Gordon (1971),28 Ohio St.2d 45, 49. Such error is waived absent plain error, and plain error does not exist unless, but for the error, the outcome at trial would have been different. State v. Joseph (1995), 73 Ohio St.3d 450,455.
Included in Article 36 is the right of an individual in custody or detention to communicate with the respective consular offices. See Statev. Loza (Oct. 13, 1997), Butler App. No. CA96-10-214, unreported. Suppression of evidence is a remedy normally reserved for alleged violations of constitutional rights. Hilliard v. Elfrink (1996),77 Ohio St.3d 155, 158. A treaty is regarded as equivalent to an act of the legislature. U.S. v. Page (C.A. 6, 2000), 232 F.3d 536, 540. Thus, as in the case of a statutory violation, the exclusionary rule is not an appropriate sanction, absent any underlying constitutional violation, unless the treaty expressly provides for such sanction. Id. There is no right in a criminal prosecution to have evidence excluded due to a violation of Article 36. Id.; see Loza (rights under treaty not constitutional in dimension and defendant not entitled to post-conviction relief); State v. Mendoza (June 29, 2001), Marion App. No. 9-01-02, unreported (rights from Vienna Convention do not rise to level of constitutional rights).
Both parties cite this court to the recent Ohio Supreme Court opinion in State v. Issa (2001), 93 Ohio St.3d 49. In conducting a plain error analysis, the Ohio Supreme Court assumed without deciding that the evidence at issue could be excluded, but expressed the following in footnote two: "We doubt whether suppression of evidence is the appropriate remedy for violation of the VCCR [Vienna Convention on Consular Relations]." Id. at 55-56.
We are not persuaded that we must change our position that appellant is not entitled to the exclusion of evidence for an alleged violation of Article 36 of the Vienna Convention. There was no error, plain or otherwise, committed by the trial court. Appellant's second assignment of error is overruled.
Assignment of Error No. 3:
 THE FINDING OF GUILT IN THE CASE SUB JUDICE WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND THE TRIAL COURT ERRED BY OVERRULING MOTIONS FOR ACQUITTAL RAISED BY DEFENDANT-APPELLANT.
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt; the relevant inquiry is whether, after viewing the evidence in a light most favorable to the state, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 260, paragraph two of syllabus.
Although appellant was convicted on two counts of the indictment, appellant assigns error to all four counts upon which the jury determined a finding of guilty. All four counts were subject to the motion for acquittal at the close of the state's case and so we will review those four counts. Appellant was found guilty by the jury of murder, involuntary manslaughter, and one count each of felonious assault and child endangering.
R.C. 2903.02(B), the murder statute, states that:
 No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of R.C. 2903.03 [voluntary manslaughter] or R.C. 2903.04 [involuntary manslaughter].
According to the indictment, the underlying felonies in the murder charge were felonious assault pursuant to R.C. 2903.11(A)(1) and child endangering pursuant to R.C. 2919.22(B)(1).
The applicable portion of R.C. 2903.04(A), the involuntary manslaughter statute, states that:
 No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony. R.C. 2903.04(A).
The underlying felony in this count was child endangering.
R.C. 2903.11(A)(1), the felonious assault statute, states:
 No person shall knowingly: (1) Cause serious physical harm to another or to another's unborn.
The child endangering statute, R.C. 2919.22(B)(1,) states:
 (B) No person shall do any of the following to a child under eighteen years of age: (1) Abuse the child.
The trial court defined a number of terms for the jury contained in the statutory language. R.C. 2901.22(B) defines knowingly as:
 A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or he is aware that his conduct will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.
The trial court instructed the jury that within the context of this case, endangering children is recklessly abusing a child under eighteen years of age which created a substantial risk of serious physical harm. See R.C. 2901.21.
R.C. 2901.22(C) defines "recklessly" as:
 A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
The trial court defined "abuse" as any act that causes physical or mental injury that harms or threatens to harm the child's health or welfare. See R.C. 2151.031.
"Serious physical harm" is defined by R.C. 2901.01 as:
 (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment; (b) Any physical harm that carries a substantial risk of death; (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.
The state presented testimony by a forensic pathologist, Robert Pfalzgraf, M.D., that Maria's head injury was the cause of death.
Dr. Pfalzgraf testified that Maria's autopsy revealed that she suffered retinal hemorrhages, a skull fracture and subdural hematoma. Dr. Phalzgraf testified that retinal hemorrhages occur generally when the "head suddenly accelerates and then decelerates as if you're shaking or if you hit the head on an object and there's a sudden stop."
Dr. Phalzgraf stated that the subdural hematoma can result from the same type of actions on the head. The skull fracture suffered by Maria, Dr. Phalzgraf opined, was the result of blunt impact to the head that occurred within hours to no more than a day before she was brought to the hospital.
The state also presented the testimony of Robert Shapiro, M.D., medical director of the Child Abuse Team at Children's Hospital, who examined Maria when she was brought into Children's Hospital. Dr. Shapiro opined that Maria's head injury was caused within a twenty-four-hour period prior to Maria's presentment to the hospital.
The police did not specifically ask appellant about Maria's head injury because they were apparently unaware of that injury when they spoke with appellant. They did ask appellant about the bruises on her head and appellant recalled that a bottle had fallen on Maria's head. Officer Taylor testified that appellant told police that Maria was very irritable and crying all the time to the point that it was frustrating.
The state presented testimony from Officer Taylor that appellant admitted to police that he engaged in specific actions during June 8 and June 9, resulting in injuries to Maria. Appellant told police that Maria was crying and kicking her legs when he attempted to change her diaper on June 8, and that he demonstrated to police that he grabbed her legs in frustration and snapped them hard. Dr. Pfalzgraf testified that Maria suffered a broken tibia in one leg and a broken femur in the other leg. Dr. Pfalzgraf indicated that the action upon the femur would have to be "pretty forceful" to fracture that bone.
Appellant told police about other acts that occurred due to his frustration with Maria's crying during the evening of June 8. Appellant stated that he had picked up Maria by the back of her neck, lifted her up and placed her in the crib. Dr. Pfalzgraf found separated or dislocated vertebrae in Maria's neck.
Dr. Pfalzgraf was asked about appellant's possible explanation of the neck injury, to which he responded that "It'd [sic] had to be moved around awfully violently." The pathologist believed that the neck injury may have occurred at the same time as the head injury because a sharp acceleration and deceleration of the head would explain both injuries.
Appellant further told police that when Maria would not stop crying while he was caring for her on June 8 appellant put his hands on her face and shook her several times attempting to stop the crying. Dr. Shapiro found a significant injury to Maria's left cheek, a bruise on the left side of her head, and a significant lesion injury to her ear.
The state presented testimony that appellant admitted to police that he bit Maria on her cheek reportedly while playing with her on June 8. The state presented a forensic dentist who testified that an evaluation of the teeth marks on Maria's cheek could eliminate Brown but not appellant as the person inflicting the bite mark. The state also presented Brown's mother, Christina Vega, who testified that she observed Maria on the evening of June 8 and Maria did not have bruises. Vega testified that she did observe bruises on Maria's cheek when she arrived to pick up Brown around 10:00 a.m. on June 9.
Appellant also admitted to police that he laid Maria face down across his lap in the evening of June 8 and punched her with a closed fist on her back to stop her crying. Appellant indicated that Maria screamed very loud after he hit her and milk came out of her nose and mouth.
Dr. Phalzgraf also testified that Maria sustained approximately forty-one separate rib fractures with some evidence of healing, and a broken clavicle that showed some healing. Appellant explained the rib injuries by stating that he caught Maria between his knees when she started falling from his lap on June 8. Both Dr. Phalzgraf and Dr. Shapiro testified that the evidence of new bone formation on some of the rib fractures indicated older injuries beginning the healing process. Dr. Shapiro testified that in his sixteen years of experience in pediatrics he had not encountered as many rib fractures as Maria exhibited.
Dr. Shapiro also outlined for the jury the numerous injuries he saw in his examination of Maria and stated that there "isn't any diagnosis that I am able to make other than battering." "There isn't a single medical entity that would mimic this."
The state presented sufficient evidence that Maria suffered serious physical harm. Appellant admitted to causing some of the injuries to Maria, and admitted to being frustrated and dealing with Maria in a forceful manner. Appellant was present and caring for the child during the time when some of the injuries likely occurred.
Construing the evidence in a light most favorable to the state, there was sufficient evidence for the trier of fact to find the essential elements of the crimes and culpable mental states proven beyond a reasonable doubt for the underlying felonies of felonious assault and child endangering. There was likewise sufficient evidence that a rational trier of fact could have found that the injury caused by appellant was the proximate cause of her death for the murder and involuntary manslaughter counts.
Additionally, the state presented sufficient evidence beyond a reasonable doubt for the trier of fact to find that the other injuries inflicted would constitute serious physical harm as defined by statute, and that appellant caused those injuries with the requisite intent for the separate counts of felonious assault and child endangering. The trial court did not err in overruling appellant's motion for acquittal during the trial and the convictions were supported by sufficient evidence. Appellant's third assignment of error is overruled.
Assignment of Error No. 4:
 THE FINDING OF GUILT IN THE CASE SUB JUDICE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Appellant asserts that the jury clearly lost its way and created a manifest miscarriage of justice when it found him guilty of the charges. Appellant asserts that appellant's statements were made under "extreme duress" and that Brown, or other family or friends could have injured the child.
The weight of the evidence concerns the inclination of the greater weight amount of credible evidence, offered in trial, to support one side of the issue rather than the other. State v. Thompkins (1997),78 Ohio St.3d 380, 387.
The standard of review based upon the manifest weight of the evidence requires the court to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id.
An appellate court will not reverse a judgment as against the manifest weight of the evidence in a jury trial unless it unanimously disagrees with the jury's resolution of any conflicting testimony. Id. at 389. An appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of syllabus.
Appellant testified on his own behalf that he suggested to Brown on previous occasions that she should take Maria to the doctor when he noticed unexplained bruising on Maria, but that Brown did not do so. Appellant testified that he asked Brown to take Maria to the hospital on June 9, but Brown stated that Maria would be taken from them because of Maria's bruises.
Appellant testified about the events of June 8 and June 9, stating that he did not harm Maria. Appellant denied the versions of events that police attributed to him. Appellant only acknowledged inflicting the bite mark and manipulating Maria's legs while changing her diaper, but denied force sufficient to injure.
Appellant testified that he noticed Maria was sleeping in her swing when he returned home around 10:00 a.m. on June 9. Brown was reportedly watching television. Appellant stated that Maria started crying and he saw a bruise on her head and noticed that Maria was having difficulty breathing after Brown left around noon. He described for police how he attempted to soothe Maria by placing her under the shower and shaking her. He stated that Maria was asleep when Brown returned at 3:00 p.m., and he left the apartment around 4:00 p.m. Maria was taken to the hospital shortly after 5:00 p.m.
Appellant also elicited testimony that Dr. Shapiro believed that Maria would have likely lost consciousness soon after sustaining her head injury. Appellant called attention to specific notations made by medical personnel in the medical records. One notation reported allegations that domestic violence was present in Maria's grandmother's relationships. Another noted that a detective indicated that both of Maria's parents admitted to hurting Maria. Appellant also presented evidence that he was a good father to Maria, that no violence was observed among the immediate family, and that Maria often had bruises.
Reviewing the record as presented by the state and appellant, and weighing the evidence and the reasonable inferences, we cannot find that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. As we previously stated, there was no evidence presented that appellant was subjected to duress, coercion or any undue influence when he made his statements to police.
Further, appellant provided police different versions of his explanation of the injuries to Maria, admitted to conduct injuring the infant, and was caring for Maria when some of the injuries were apparently inflicted.
Appellant's convictions were not against the manifest weight of the evidence and his fourth assignment of error is overruled.
Assignment of Error No. 5:
 THE TRIAL COURT ERRED WHEN IT ADMITTED TESTIMONY BY DR. SHAPIRO WITHOUT PROPER FOUNDATION.
Assignment of Error No. 6:
 THE TRIAL COURT ERRED WHEN IT ADMITTED IRRELEVANT TESTIMONY AT TRIAL.
Assignment of Error No. 7:
 THE TRIAL COURT ERRED WHEN IT ADMITTED TESTIMONY AT TRIAL WHICH WAS SUBSTANTIALLY MORE PREJUDICIAL THAN PROBATIVE.
These three assignments of error are combined because they all involve the testimony of Dr. Shapiro. Appellant failed to object to Dr. Shapiro's testimony on these issues at trial, and therefore these assignments will be reviewed for plain error.
Appellant first argues that the trial court permitted Dr. Shapiro to testify about his diagnosis, the force necessary to break bones, and the type of handling that would result in injuries without a scientifically valid basis for such opinion.
The admission or exclusion of evidence rests in the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173, 180. Evid.R. 103(A). The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. State v. Adams (1980),62 Ohio St.2d 151,157.
In order to be admitted at trial, expert testimony must relate to scientific, technical, or other specialized knowledge, assist the trier of fact to understand the evidence or to determine fact in issue, be relevant and material to issue in the case and have probative value that outweighs any prejudicial impact. State v. Daws (1994),104 Ohio App.3d 448, 462, appeal dismissed as improvidently allowed (1996), 74 Ohio St.3d 1284.
Under Ohio Evid.R. 702, a witness may testify as an expert if all of the following apply:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply * * *.
Ohio Evid.R. 703 states that the facts or data in the particular case upon which the expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing.
Dr. Shapiro examined Maria as part of the medical team at Children's Hospital. Dr. Shapiro testified concerning his examination of Maria and her injuries he personally observed and found by x-ray films. Dr. Shapiro is the director of the Child Abuse Team at Children's Hospital and has practiced pediatric medicine for sixteen years. Dr. Shapiro's curriculum vitae detailing his experience in pediatrics and child abuse issues was admitted into evidence.
First, we reject appellant's argument that Dr. Shapiro's diagnosis was given without proper foundation. Dr. Shapiro testified that he had to "look at the big picture" in making a diagnosis, and in doing so Dr. Shapiro detailed the numerous injuries and factors he observed that assisted him, based upon his experience, in forming his diagnosis.
In addition, Dr. Shapiro's testimony was based on reliable specialized information as a physician dealing with pediatric injuries and disease. Dr. Shapiro also testified to methods and force necessary for those injuries, as gleaned through his specialized knowledge. Dr. Shapiro's testimony was admitted to assist the trier of fact in matters beyond the knowledge and expertise possessed by lay persons.
The weight or credibility the jury afforded the testimony was a question for the jury to determine. See State v. DeHass (1967),10 Ohio St.2d 230. The trial court did not abuse its discretion in permitting the testimony, and we find no error by the trial court.
Appellant next asserts that it was error to admit Dr. Shapiro's testimony because such testimony was irrelevant and its prejudicial effect outweighed its probative value.
Ohio Evid.R. 401 states that relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
Ohio Evid.R. 403(A) states that, although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, or confusion of the issues, or of misleading the jury.
We have previously determined that no error existed concerning the foundation for Dr. Shapiro's testimony. Certainly Dr. Shapiro's testimony regarding his examination of Maria's injuries and his extensive experience in child abuse is relevant and probative to the issues for the jury in the instant case.
We fail to see how Dr. Shapiro's testimony confused or mislead the jury on the issues before it, caused undue delay or constituted cumulative evidence. Granted, Dr. Shapiro's testimony, if believed, may not have been beneficial to appellant. Logically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant. State v. Wright (1990), 48 Ohio St.3d 5, 8. It is only the latter that Evid.R. 403 prohibits. Id.
The probative value of Dr. Shapiro's testimony was not substantially outweighed by the danger of unfair prejudice to appellant. The jury was confronted with an infant with extensive injuries. The Evid.R. 403 balancing of the probative value against the danger of material prejudice would not have prevented the state from presenting Dr. Shapiro's testimony. There was no error by the trial court in this regard.
We have failed to find any error by the trial court on the three assignments of error regarding Dr. Shapiro's testimony. Therefore, finding no error, there is no need to evaluate these three assignments for plain error. Appellant's fifth, sixth and seventh assignments of error are overruled.
Assignment of Error No. 8:
DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.
Appellant argues that he was prejudiced by his trial counsel's failure to object to Dr. Shapiro's testimony, to move for suppression of evidence obtained in contravention of Article 36 of the Vienna Convention on Consular Relations, to object to the admission of Dr. Shapiro's testimony, to seek a medical expert to explain alternatives to the cause of Maria's injuries, and to hire a linguistics expert to discuss language translation issues.
When reviewing appellant's claim of ineffective assistance of counsel, this court engages in the two-pronged test enumerated in Strickland v.Washington (1984), 466 U.S. 668, 690-91, 104 S.Ct. 2052, 2066. We determine: whether counsel's performance fell below an objective standard of reasonable professional competence, and if so whether there is a reasonable probability that counsel's unprofessional errors prejudiced appellant so as to deprive him of a fair trial. Id. To show error in counsel's actions, appellant must overcome the strong presumption that licensed attorneys are competent and that the challenged action is the product of sound trial strategy and falls within the wide range of reasonable professional assistance. Id. To show resulting prejudice, appellant must establish a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceedings would have been different. Id.
Trial counsel's failure to object to specific portions of Dr. Shapiro's testimony or to the admission of Dr. Shapiro's testimony in its entirety does not fall outside sound trial strategy and the wide range of reasonable professional assistance.
This case involved the unavoidable issue of dealing with the extensive and serious injuries to an eleven-week-old infant. It may have been trial strategy for appellant himself to utilize cross-examination of Dr. Shapiro to emphasize the timing of various injuries and to call attention to other potential perpetrators.
Further, trial counsel's decision not to call expert witnesses for injury causation and linguistics may also fall within trial strategy. A decision not to retain an expert witness does not necessarily constitute ineffective assistance of counsel. See State v. Thompson (1987),33 Ohio St.3d 1. The appellate court must not second-guess trial counsel's strategic decisions. State v. Carter (1995), 72 Ohio St.3d 545,558.
As we previously determined in our discussion of the second assignment of error, the failure by police to apprise appellant of his rights under the Vienna Convention did not entitle appellant to the exclusion of his statements. Therefore, trial counsel's failure to raise the issue to the trial court does not constitute prejudicial error for ineffective assistance of counsel.
We have reviewed the record and cannot say that appellant's counsel's performance fell below an objective standard of reasonableness or that, but for counsel's errors, the results of the proceedings would have been different. Appellant's eighth assignment of error is overruled.
Assignment of Error No. 9:
 THE TRIAL COURT ERRED BY IMPOSING CONSECUTIVE SENTENCES.
Appellant argues that felony murder and felonious assault are allied offenses of similar import, and that the trial court was not permitted to assign consecutive sentences for the two counts.
A review of the record finds that appellant moved to merge as allied offenses of similar import all counts upon which the jury made findings of guilt. The trial court implicitly overruled said objection by convicting and sentencing appellant on two counts. The trial court found that appellant committed the murder and felonious assault with a separate animus.
R.C. 2941.25, provides that:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictments or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of similar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
When determining whether two or more offenses are allied offenses of similar import, the court should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes correspond to such a degree that the commission of one crime will result in the commission of the other. State v. Rance (1999), 85 Ohio St.3d 632,635-636. If the elements do so correspond, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus. R.C. 2941.25(B). Id. at 638-639.
Upon review of the elements of the charges of felony murder and felonious assault, we find that the two charges are not allied offenses of similar import. Felony murder requires causing death while committing a first or second-degree felony of violence, whereas felonious assault requires knowingly causing serious physical harm to another. The commission of one crime does not result in the commission of the other. R.C. 2945.25.
Appellant argues that felonious assault was a necessary precursor to felony murder and thereby an allied offense of similar import. We reject appellant's argument based upon State v. Keene (1998), 81 Ohio St.3d 646,668 (felony-murder under R.C. 2903.01(B) is not an allied offense of similar import to the underlying felony, and R.C 2941.25 authorizes punishment for both crimes). Appellant's ninth assignment of error is overruled.
Assignment of Error No. 10:
 THE TRIAL COURT COMMITTED SO MANY CUMULATIVE ERRORS WARRANTING A REVERSAL OF DEFENDANT-APPELLANT'S CONVICTION.
Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives appellant of a fair trial, despite the fact that each error individually does not constitute cause for reversal. State v.Fears (1999), 86 Ohio St.3d 329, 348. The doctrine of cumulative error is not applicable where appellant fails to establish multiple instances of harmless error during the course of the trial. State v. Garner
(1995), 74 Ohio St.3d 49, 64. Since this court has found no instance of error in the trial court below, the doctrine of cumulative error is not applicable and appellant's assignment of error is overruled. The judgment and sentence is affirmed.
WALSH and POWELL, JJ., concur.
[1] The jury also found appellant guilty of involuntary manslaughter under R.C. 2903.04(A) and of child endangering under R.C. 2919.22(B)(1). The trial court determined that involuntary manslaughter was an allied offense of similar import and merged it with the murder count, and that the child endangering count was an allied offense of similar import with felonious assault and merged it with the felonious assault count. The jury found appellant not guilty of two additional counts of child endangering and felonious assault. The merger of these counts is not raised in this appeal.